# United States Court of Appeals for the First Circuit

SＵＮ ＣＡＰＩＴＡＬ ＰＡＲＴＮＥＲＳ III, LP, ＥＴ ＡＬ.,

*Plaintiffs-Appellants,*

v.

NＥＷ ＥＮＧＬＡＮＤ ＴＥＡＭＳＴＥＲＳ & ＴＲＵＣＫＩＮＧ ＩＮＤＵＳＴＲＹ ＰＥＮＳＩＯＮ ＦＵＮＤ,

*Defendant-Third Party Plaintiff-Appellee,*

SＣＯＴＴ ＢＲＡＳＳ ＨＯＬＤＩＮＧ ＣＯＲＰ.; SＵＮ SＣＯＴＴ ＢＲＡＳＳ, LLC,

*Third Party Defendants.*

**On Appeal from the United States District Court
for the District of Massachusetts, Boston
Case No. 10-CV-10921, Hon. Douglas P. Woodlock**

## APPELLANTS' REPLY BRIEF

table

| Theodore J. Folkman | John F. Hartmann | John C. O'Quinn |
|---|---|---|
| PIERCE BAINBRIDGE | KIRKLAND & ELLIS LLP | Matthew D. Rowen |
| BECK PRICE & | 300 N. LaSalle Street | KIRKLAND & ELLIS LLP |
| HECHT LLP | Chicago, IL 606054 | 1301 Pennsylvania Ave., NW |
| One Liberty Square | (312) 862-2000 | Washington, DC 20004 |
| Boston, MA 02109 | | (202) 389-5000 |
| (617) 313-7401 | | |

*Counsel for Plaintiffs-Appellants*

August 19, 2019

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellants Sun Capital Partners III, LP, Sun Capital Partners III, QP, LP (together, "SFIII"), and Sun Capital Partners IV, LP ("SFIV"), each states that it has no parent corporation and that no publicly held company has a 10% or greater ownership interest in it.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION .................................................................................. 1

ARGUMENT ........................................................................................ 7

I.  The District Court's Decision To Invent A Fictitious
    Partnership-In-Fact Atop The LLC Is Indefensible ........................ 7

    A.  The Decision Below is Unprecedented ................................... 7

    B.  The Pension Fund's Remaining Arguments Do Not
        Justify the District Court's Unprecedented Decision ........... 18

II. The Fictitious Partnership-In-Fact Was Not Engaged In
    Any "Trade Or Business" Under 29 U.S.C. § 1301(b)(1) .............. 23

    A.  All the Fictitious Partnership-In-Fact Could Possibly
        Have Done Was Make a Mere Investment ........................... 23

    B.  The Fictitious Partnership-In-Fact Lacks Any "Plus"
        Factors ................................................................................ 28

CONCLUSION ................................................................................... 33

# TABLE OF AUTHORITIES

## Cases

*Bd. of Trs. of Trucking Emps. of N. Jersey. Welfare Fund, Inc.– Pension Fund v. Canny,*
900 F. Supp. 583 (N.D.N.Y. 1995) .................................. 3, 16

*Bd. of Trs. of W. Conf. of Teamsters Pension Tr. Fund v. Lafrenz,*
837 F.2d 892 (9th Cir. 1988) ...................................... 2, 14, 15

*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Palladium Equity Partners, LLC,*
722 F. Supp. 2d 854 (E.D. Mich. 2010) ............................. 19

*Cent. States Se. & Sw. Areas Pension Fund v. Miller,*
868 F. Supp. 995 (N.D. Ill. 1994) ................................... 16

*Comm'r v. Culbertson,*
337 U.S. 733 (1949) ................................................. 11

*Comm'r v. Groetzinger,*
480 U.S. 23 (1987) .................................................. 3

*Comm'r v. Tower,*
327 U.S. 280 (1946) ................................................. 17

*Connors v. Ryan's Coal Co.,*
923 F.2d 1461 (11th Cir. 1991) ................................ 9, 10, 12

*Mass. Laborers' Health & Welfare Fund v. Starrett Paving Corp.,*
845 F.2d 23 (1st Cir. 1988) ......................................... 12

*Pension Benefit Guar. Corp. v. Beverley,*
404 F.3d 243 (4th Cir. 2005) ................................... 13, 14

*Sheet Metal Workers Local 22 Pension, Welfare, Annuity, Educ., Training & Indus. Funds v. Valenti,*
2010 WL 3515580 (D.N.J. 2010) ................................... 16

*Sun Capital Partners III, LP*
    *v. New England Teamsters & Trucking Indus. Pension Fund*,
    172 F. Supp. 3d 447 (D. Mass. 2016)..........................................*passim*

*Sun Capital Partners III, LP*
    *v. New England Teamsters & Trucking Indus. Pension Fund*,
    329 F.R.D. 102 (D. Mass. 2018) ...........................................1

*Sun Capital Partners III, LP*
    *v. New England Teamsters & Trucking Indus. Pension Fund*,
    724 F.3d 129 (1st Cir. 2013) ......................................*passim*

*Sun Capital Partners III, LP*
    *v. New England Teamsters & Trucking Indus. Pension Fund*,
    903 F. Supp. 2d 107 (D. Mass. 2012)..........................2, 8, 18

*United States v. Clark*,
    358 F.2d 892 (1st Cir. 1966) ................................................3

**Statutes and Regulations**

26 C.F.R. § 1.414 ....................................................................3

26 U.S.C. § 401(a)(4)............................................................21

26 U.S.C. § 410(b)................................................................21

29 C.F.R. § 4001.2 ..................................................................3

29 C.F.R. § 4001.3(a) ..............................................................3

29 U.S.C. § 1301(b)(1).................................................*passim*

29 U.S.C. § 1381 ......................................................................2

29 U.S.C. § 1392(c) .........................................................11, 22

## INTRODUCTION

According to Appellee New England Teamsters and Trucking Industry Pension Fund ("the Pension Fund"), Appellants SFIII and SFIV "have made a decidedly political argument" simply by asking this Court to reverse a decision entered in favor of a pension fund and against "private equity funds." Br. of Appellee ("Br.") 39. That is a remarkable charge, though one that opens a helpful window into the decision below. As the Pension Fund's brief confirms, the court below invented a brand-new theory of implied partnerships and used that novel theory to circumvent long-settled principles of corporate law and "control group" jurisprudence, all in support of what it perceived to be "the primary purpose" of the Multiemployer Pension Plan Amendments Act ("MPPAA")—namely, "protecting employees' benefits" by "ensur[ing] the viability of multiemployer pension plans against the failure of a contributing employer." *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 172 F. Supp. 3d 447, 459 (D. Mass. 2016); *see also Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 329 F.R.D. 102, 109 (D. Mass. 2018); *Sun Capital Partners III, LP v. New England Teamsters &*

*Trucking Indus. Pension Fund*, 903 F. Supp. 2d 107, 109 n.1 (D. Mass. 2012).  SFIII and SFIV do not deny that promoting the financial health of pension plans was an important consideration behind the MPPAA.  But that does not permit courts to ignore statutory text, judicial precedent, and long-settled legal principles in pursuit of that consideration.  Nor is it "political" for Appellants to say so.

For all of the Pension Fund's rhetoric, this case boils down to two basic questions:  Can a federal court invent an implied partnership-in-fact between entities that chose to invest through a formal LLC?  And even if so, was the implied partnership-in-fact the district court invented engaged in a "trade or business" within the meaning of 29 U.S.C. § 1301(b)(1)?  Applying basic, well-settled legal principles, rather than an outcome-driven approach, the answer to both questions is clearly "no."

The governing principles are clear.  The MPPAA imposes "withdrawal liability" on any "employer" that stops contributing to its multi-employer pension plan.  29 U.S.C. § 1381.  The MPPAA also imposes withdrawal liability on "trades and businesses operated under common control" with that employer.  *Bd. of Trs. of W. Conf. of Teamsters Pension Tr. Fund v. Lafrenz*, 837 F.2d 892, 893 (9th Cir. 1988); *see Bd. of*

*Trs. of Trucking Emps. of N. Jersey. Welfare Fund, Inc.–Pension Fund v. Canny*, 900 F. Supp. 583, 589 (N.D.N.Y. 1995) ("each member of" "a commonly controlled group of trades or businesses" "is liable for the withdrawal of any other member of the group"); 29 U.S.C. § 1301(b)(1). As this Court held in its prior opinion in this case, an entity may not be considered a "trade or business" under the MPPAA unless (1) its "'primary purpose'" is "'income or profit,'" *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 139 (1st Cir. 2013) (quoting *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987)), **and** (2) it "undertake[s]" certain other "activities as to the [employer]" (sometimes known as "plus factors") that entitle it to income or profit from the employer in a manner "'different from that flowing to a [mere] investor,'" *id.* at 142–43 (quoting *United States v. Clark*, 358 F.2d 892, 895 (1st Cir. 1966)). Separately, an entity may not be considered in "common control" with an employer under the MPPAA (at least as relevant here) unless it has an 80%-or-greater ownership interest in the employer. 29 C.F.R. §§ 4001.2, 4001.3(a); 26 C.F.R. § 1.414(c)–2(b).

Those settled principles demonstrate the error of the decision below. It is undisputed that the only MPPAA "employer" in this case is

Scott Brass, Inc. ("SBI"), a metal coil manufacturer that went bankrupt in 2008 and was unable to continue contributing to its multi-employer pension plan, thus incurring "withdrawal liability" under ERISA. It is also undisputed that neither SFIII nor SFIV has an 80%-or-greater ownership interest in *either* SBI *or* the limited-liability company (Sun Scott Brass, LLC, or "SSB-LLC") through which they invested in SBI. And it is the law of the case *not only* that SFIII and SFIV are distinct entities, *see* 172 F. Supp. 3d at 463 (recognizing lack of "operational and institutional overlap between the Funds"), *but also* that their separate business decisions to each individually acquire less than 80% of SBI were bona fide and did not improperly evade or avoid withdrawal liability, *see* 724 F.3d at 150 ("This is simply not a case about an entity with a controlling stake of 80% or more under the MPPAA seeking to shed its controlling status to avoid withdrawal liability.").

Instead of following undisputed facts and settled law, the district court invented a *fictitious* general partnership-in-fact that supposedly sat on top of the *actual* LLC, and through which joint-and-several liability could be passed onto SFIII and SFIV. As the Pension Fund's brief lays bare, however, the district court's inventive abstractions make

4

sense (if at all) *only if* one accepts *not only* that the two independent entities (SFIII and SFIV) were not independent at all, *but also* that their independent business decisions to invest in the now-bankrupt manufacturer (SBI) through a limited-liability company were actually a single sham transaction that improperly avoided withdrawal liability. Yet that is exactly what this Court rejected in the last appeal. That is reason enough to reverse.

But that is far from the only reversible error on this record. The decision below is the first case in American legal history (outside the well-defined veil-piercing context) to invent a general partnership-in-fact between, and thus impose pass-through liability on, parties that organized themselves into a bona fide formal limited-liability entity. Unlike SFIII and SFIV here, the cases the Pension Fund and its amicus cite involved individuals (usually married to one another) that had not organized themselves into *any* formal legal entity at all, let alone a limited-liability entity that expressly disclaimed an intent to create a partnership. Accepting the district court's unprecedented theory would work a fundamental and potentially boundless change to bedrock principles of corporate law. Under the district court's rationale, *any* legal

entity such as a limited liability company, or even a corporation, could be said to be "owned" or "controlled" by an implied general partnership, of which the formal entity's members or stockholders are implied general partners, thus sharing in liability.

The decision below is also wrong on its own terms. The district court found the partnership-in-fact it invented existed only "antecedent to" the LLC's creation and solely to "investigate" whether to invest in SBI. 172 F. Supp. 3d at 460, 464, 467. As such, the only thing the partnership-in-fact itself possibly could have done was make the decision to invest in SBI. But this Court already found that merely making an investment is not enough be considered a "trade or business" under 29 U.S.C. § 1301(b)(1); instead, something more is required. *See* 724 F.3d at 134, 141–43. Yet under the district court's own theory, the fictitious partnership-in-fact did nothing more. To preserve basic corporate law principles and precedents, not to mention this Court's own prior mandate, the decision below must be reversed.

# ARGUMENT

## I. The District Court's Decision To Invent A Fictitious Partnership-In-Fact Atop The LLC Is Indefensible.

According to the Pension Fund, "case law has clearly found that" a partnership-in-fact may be implied "[e]ven when partners disclaim that a partnership exists, as the Sun Funds do in this case." Br.29 (footnote omitted). What the Pension Fund fails to acknowledge, however, is that none of the cases that have implied a partnership-in-fact involved parties that had organized themselves *into a formal legal entity*, let alone a limited-liability entity, as SFIII and SFIV did here. That distinction is dispositive, as explained below. Tellingly, the facts of this case are nothing like those in the cases the Pension Fund invokes. Ultimately, there is no way to affirm the decision below without doing violence to basic principles of corporate law, the plain text of the MPPAA, and this Court's previous mandate.

### A. The Decision Below is Unprecedented.

In the course of holding that SFIII and SFIV unwittingly created a "partnership-in-fact" subject to withdrawal liability under the MPPAA, the district court cited *no* cases finding an implied partnership between, and imposing pass-through liability on, parties that had organized

themselves into a formal limited-liability entity. The Pension Fund's brief is similarly bare. To be sure, the Pension Fund cites "numerous cases" finding that parties "formed a de facto partnership that was under common control with the withdrawing entity." Br.34. But **none** of those cases found an implied partnership between parties that had organized themselves into, and invested through, a formal limited-liability entity. That is because no such case exists. Moreover, this case does not involve the mere "absence of an express partnership," as the district court observed. *See* 172 F. Supp. 3d at 466. It also involves the commonly accepted conduct of organizing and investing through a well-recognized, non-sham limited-liability entity. Indeed, there was no "express partnership" here precisely because there **was** an express LLC—one that expressly **disclaimed** the formation of a partnership. Implying a partnership in that circumstance would render these recognized legal entities illusory, calling into question bedrock principles of American corporate law.[1] In all events, the cases the Pension Fund cites only serve to show the errors the district court committed.

---

[1] That is especially true given that the district court did not find that SSB-LLC was **itself** actually a partnership, *see, e.g.*, 903 F. Supp. 2d at 119 (rejecting argument that SSB-LLC "should be treated as a

The Pension Fund relies heavily, but mistakenly, upon *Connors v. Ryan's Coal Co.*, 923 F.2d 1461 (11th Cir. 1991). *See, e.g.*, Br.17–18, 34, 36. In that case, "George Simmons and members of his family owned interests in several different enterprises which mined coal and serviced the coal mining industry." 923 F.2d at 1463. One of those enterprises, Ryan's Coal, "was a signatory to the National Bituminous Coal Wage Agreements" and accordingly "was obligated to contribute to [pension] plans on behalf of its employees." *Id.* at 1463–64. Ryan's Coal ultimately ceased operations and defaulted on its contribution obligations, at which point it "became subject to withdrawal liability under the provisions of the MPPAA." *Id.* at 1464. The trustees of the coal workers' pension fund then sued George (Ryan's Coal's alter ago), Alan's Coal (Ryan's Coal's successor), a number of Simmons-owned entities they alleged were "trades or businesses under common control of the signatory employer," and, finally, George's wife Janice. *Id.* at 1464 & nn.18, 20. The trustees claimed that Janice had a "partnership interest in a cattle farm jointly owned with her husband," and thus "was liable for the delinquent

_____

partnership"), but instead invented a partnership somehow sitting atop SSB-LLC.

withdrawal liability payments," because the cattle farm was a trade or business under common control with Ryan's Coal. *Id.* at 1464. The district court agreed, and Janice appealed. The sole question on appeal was whether Janice "was indeed a partner in the cattle farm operation." *Id.* at 1466. Even though the cattle-farm operation had "no actual partnership agreement," *id.* at 1467, the Third Circuit answered that question in the affirmative.

The Pension Fund seems to believe that because a partnership-in-fact was implied in *Ryan's Coal* even though "no actual partnership agreement was executed" between George and Janice Simmons, *id.*, the same result should obtain here. But this case is nothing like that one. The parties found to be partners-in-fact in *Ryan's Coal* engaged in a range of conduct indicative of joint intent that is wholly absent here. The cattle-farm operation "was located on land owned 40% by George [] and 60% by George and Janice [] jointly." *Id.* Despite that separation, the cattle-farm operation made singular mortgage payments on ***both*** the land owned by George Simmons alone ***and*** the land owned by Janice and George jointly. *Id.* Moreover, Janice and George took those mortgage payments as deductions on their single, ***joint*** federal tax return, *id.*, and

a federal tax deduction formally shared by two parties who co-own business property is nearly unassailable evidence that the parties have in fact "joined together … to conduct a business," *see Comm'r v. Culbertson*, 337 U.S. 733, 744–45 (1949).  In other words, the parties there ***acted like partners***.

This case is entirely different.  SFIII and SFIV make different investments, maintain separate accounts and finances, and, perhaps most notably, have always filed ***separate*** tax returns.  JA53–56 ¶¶ 9, 14–16, 20–24, 27–33; *see* 172 F. Supp. 3d at 463 (SFIII and SFIV "filed the[ir tax returns] separately").  Indeed, it was for precisely that reason that the district court declined to treat SFIII and SFIV as alter egos of each other.  *Id.* ("The conventional theories of a general partnership— those that on the face reflect operational and institutional overlap between the Funds—are not evident here.").  Again, the district court made no findings to support veil-piercing, which is the only other way a court can impose pass-through liability on members of a formal limited-liability company that, as this Court already held, did not improperly evade federal-law liability.  *See* 724 F.3d at 149 (rejecting the Pension Fund's "evade or avoid" theory of liability under 29 U.S.C. § 1392(c)).

Moreover, SFIII and SFIV not only "disclaimed any intent to form a partnership or joint venture," but separately decided to invest in SSB-LLC—a formal, limited-liability entity. 172 F. Supp. 3d at 463. By contrast, the husband and wife found to be in a partnership-in-fact in *Ryan's Coal* had not organized themselves into ***any*** formal or recognized entity at all, much less disclaimed a partnership. 923 F.2d at 1463–64.

That distinction is dispositive. It is black-letter law that in order to impose liability on a member of a limited-liability company, a court must either pierce the veil or make a finding of alter ego. *E.g.*, *Mass. Laborers' Health & Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 27 (1st Cir. 1988) (sole shareholder not liable under ERISA where there was "no basis … for 'corporate veilpiercing,' or 'alter ego' liability"). In *Ryan's Coal*, the conduct of the husband-and-wife operation found to be a partnership had not been conducted via, or pursuant to, any recognized corporate entity, so the ruling did not circumvent a recognized limited-liability entity. But here, SFIII and SFIV created and acted through SSB-LLC, the creation of which did not improperly avoid withdrawal liability (as this Court held, 724 F.3d at 150), and the district court did not find any basis to pierce the veil of SSB-LLC, 172 F. Supp. 3d at 463.

Nor could the district court disregard the distinction between SFIII and SFIV, given its recognition that the two funds "have separate financial statements, separate reports to their partners, separate bank accounts, largely non-overlapping sets of limited partners, and largely non-overlapping portfolios of companies in which they have invested." *Id.* (finding there was no "operational and institutional overlap between the Funds"). *Ryan's Coal* provides no basis for implying a partnership-in-fact where, as here, the parties have organized themselves into a bona fide, limited-liability entity.

None of the Pension Fund's other cases supports the decision below either. *Pension Benefit Guaranty Corp. v. Beverley*, 404 F.3d 243 (4th Cir. 2005), cited at Br.35, presents virtually identical facts to those in *Ryan's Coal*. As in *Ryan's Coal*, a married couple (Martha and Don Beverley) "jointly owned real property," which they leased to a company the family controlled, Don's Trucking Company. *Id.* at 250. As in *Ryan's Coal*, the married couple had "no express agreement … regarding the leasing activity." *Id.* at 252. As in *Ryan's Coal* (but unlike here), the married couple "deducted" the rent payments their company made into their joint personal account "***as expenses on their personal joint tax***

***returns***." *Id* at 252–53. (emphasis added). And, as in *Ryan's Coal*, the married couple ***did not organize themselves into any formal entity***, let alone a formal limited-liability entity like the LLC here. The Fourth Circuit's decision holding that Martha Beverley was in a partnership-in-fact with her husband "for the leasing of their jointly owned real property to Don's Trucking," *id.* at 250, and accordingly was liable for the company's pension obligations*, see id.* at 252–53, thus provides no support for the district court's holding here. SFIII and SFIV's separate bona fide business decisions to invest in and through a limited-liability company bear no resemblance to this implied-in-fact family partnership, much less somehow create an implied partnership that sat atop the LLC structure and passed its liabilities through to the funds as the general partners of the judicially-created partnership-in-fact.

*Board of Trustees v. Lafrenz*, 837 F.2d 892 (9th Cir. 1998), cited at Br.35, is similarly unhelpful to the Pension Fund. There yet another married couple (Stanley and Anita Lafrenz) owned, between them, 96% of Lewiston Pre-Mix Concrete, Inc. *Id.* at 893. The Lafrenzes also "own[ed] and lease[d] for profit two Mack dump trucks." *Id.* As in *Ryan's Coal* and *Beverley*, the Lafrenzes had no formal partnership agreement

for the dump truck operation.  And, also as in *Ryan's Coal* and *Beverley*,
the Lafrenzes jointly "leased the" informal partnership's property (here,
the dump trucks) "for profit," which meant "that the Lafrenz truck-
leasing operation [wa]s a 'trade or business' under [ERISA]."  *Id.* at 894.
The court of appeals thus had no trouble affirming that the Lafrenzes
"were liable for Pre-Mix's withdrawal liability under ERISA" "as sole
owners of the unincorporated truck-leasing operation," because "the
truck-leasing operation and Pre-Mix were under the Lafrenzes' common
control."  *Id.* at 893.

The key word there is "**unincorporated**."  *See id.* at 895 (The
Lafrenzes "are liable because of their status as the sole proprietors of ***an
unincorporated trade or business*** under their common control."
(emphasis added)).  Like *Ryan's Coal* and *Beverley*, all *Lafrenz* holds is
that two individuals that jointly operate ***an informal unincorporated
business*** that is in common control with an ERISA employer may be held
liable for withdrawal liability under ERISA and the MPPAA.  But that is
not this case.  There is no basis for implying a partnership to address
joint conduct where parties already organized into a formal, legally-
recognized entity for such conduct.  To be clear, this case involves the

imposition of liability on a pass-through basis to members of a formal limited-liability company, the creation of which did not improperly evade withdrawal liability—as this Court already held. *See* 724 F.3d at 150; *see also* Br.24 (quoting Dist. Ct. Dkt. 94 at 22). The appellate decisions the Pension Fund cites thus lend no support to the district court's decision here. Nor do the district court decisions the Pension Fund cites (at Br.35). *See Sheet Metal Workers Local 22 Pension, Welfare, Annuity, Educ., Training & Indus. Funds v. Valenti*, 2010 WL 3515580 (D.N.J. 2010) (married couple; court found "ample evidence to support piercing the corporate veil"); *Canny*, 900 F. Supp. 583 (group of individuals leased jointly-owned real property to obligor; no formal entity among them); *Cent. States Se. & Sw. Areas Pension Fund v. Miller*, 868 F. Supp. 995 (N.D. Ill. 1994) (similar).

The Pension Benefit Guaranty Corporation's ("PBGC") amicus brief likewise identifies ***zero*** cases finding an implied partnership between parties that had organized themselves into a formal limited-liability entity (so as to impose pass-through liability), absent facts supporting veil piercing or fraud. The cases PBGC does invoke are inapposite. Like the Pension Fund, PBGC relies on *Commissioner v. Tower*, 327 U.S. 280

(1946).  That case involved a married couple (once again) attempting to wrongfully reduce one spouse's reported income-tax liability by forming a limited partnership and attributing some of the income to the other spouse—who had not substantially contributed to and did not control the assets.  The Supreme Court unsurprisingly found that couple's arrangement to be, in essence, a sham; notably, however, ***it did not hold or suggest that a general partnership could be implied atop or instead of the limited partnership so as to expand liability***.  Here, of course, this Court already rejected the argument that the creation of an LLC by SFIII and SFIV was an improper act to evade or avoid "withdrawal liability"—a holding PBGC does not even acknowledge.  *Tower* provides no support for the decision below.

In sum, ***no*** case supports what the Pension Fund and its amicus advocate.  Sustaining the district court's decision would bring to an end the general certainty surrounding the treatment of limited-liability entities.  Under the Pension Fund's approach, the very act of creating a limited-liability entity for its intended purpose can give rise to the unwitting creation of an implied general partnership, through which all sorts of liabilities may flow.  Nothing in the MPPAA invites such chaos.

Nor can anything in the MPPAA (or any other source of law) cabin the district court's reasoning to the context of "withdrawal liability."

## B.    The Pension Fund's Remaining Arguments Do Not Justify the District Court's Unprecedented Decision.

Beyond inapt comparisons to cases where parties had not created any formal entity for their conduct, the Pension Fund asserts a hodgepodge of additional arguments in defense of the decision below. None has merit.

First, the fact that SFIII "is actually two parallel funds," Br.32, does not support the district court's decision. That is for a simple reason: whereas the two SFIII funds are "parallel," 172 F. Supp. 3d at 461, which means they are "run by one general partner and generally make the same investments in the same proportions," 903 F. Supp. 2d at 109 n.1, the SFIII funds are decidedly not parallel *with SFIV*. To the contrary, as even the district court recognized, SFIII and SFIV are not run by a single partner, and they do not always (or even typically) make the same investments. *See* 172 F. Supp. 3d at 465 n.14 ("Sun Fund III and Sun Fund IV were not parallel funds. Of the 43 LLCs in which Sun Fund III held an interest and the 52 LLCs in which Sun Fund IV did, *only seven*

***overlapped***.").[2]  Although **the two SFIII funds** are arguably situated similarly to the parallel funds in *Board of Trustees, Sheet Metal Workers' National Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 854 (E.D. Mich. 2010), which the Pension Fund discusses at length, *see* Br.33–34, that is beside the point, because the relationship **between SFIII and SFIV** is not analogous.  *See* 172 F. Supp. 3d at 465 n.14 ("Clearly, Sun Fund III and Sun Fund IV operated more independently than parallel funds, including the funds in *Palladium*[.]").

The Pension Fund sees no distinction between aggregating the interests of two parallel funds and aggregating the interests of two disparate members of a formal limited-liability company.  *See* Br.32–34.  But the distinction could not be more obvious.  Precisely because they are **parallel**, the SFIII funds act in concert (beyond the context of the SBI investment), but have not formed any limited-liability entity that by law limits their pass-through liability—much like the parallel funds in *Palladium*.  That lack of a formal limited-liability-shield, coupled with

---

[2]  The Pension Fund's focus on the approximately half-dozen overlapping investments SFIII and SFIV independently made, *e.g.*, Br.8–9, 15, 23, 27, out of some **ninety-five** total, 172 F. Supp. 3d at 465 n.14, is myopic.  The fact that less than 8% of SFIII's and SFIV's collective investments overlap demonstrates that they are not parallel funds.

broad, coordinated—indeed, *parallel*—behavior, might potentially permit the inference of a general partnership. *See* 172 F. Supp. 3d at 465. Appellants have never argued that the two parallel SFIII funds should be treated distinctly. But the combined SFIII funds do not have the requisite ownership required for withdrawal liability; such liability can only be imposed if SFIV is improperly lumped in. Yet, as even the district court acknowledged, SFIV does not act in parallel with SFIII, nor do they share common control and other attributes; instead, SFIII and SFIV "operate[] independently." *Id*. at 465 n.14. The independent decisions of SFIII and SFIV to invest through SSB-LLC therefore cannot be the basis for implying a general partnership with pass-through liability when, by law, that LLC *limits their pass-through liability*. The creation of a formal, legally-recognized entity makes this case categorically different from those where parties created no such entity, but acted together jointly as though they were in a partnership.

What the Pension Fund and its amicus are really suggesting is that the LLC here is a sham—but this Court already rejected that argument. 724 F.3d at 150. Treating SFIII and SFIV like parallel funds (to pass on withdrawal liability) based on their respective *independent* decisions to

invest through an LLC would be both unprecedented and unbounded. An affirmance would mean no investors may ever shield themselves from pass-through liability under the MPPAA when making a ***new*** investment in a distressed company. Accepting that remarkable conclusion would have potentially devastating consequences for investors and pension funds alike. As this Court noted in its prior opinion, the terms of 29 U.S.C. § 1301(b) are expressly tied to the control group provisions of the Internal Revenue Code. *See* 724 F.3d at 138–39. Thus, as Appellants pointed out in their opening brief, finding two members of a formal limited-liability company to be in "common control" for purposes of § 1301(b)(1) portends a host of unanticipated liabilities. *See* Appellants'.Br.58–59.

Even more remarkable than those potentially far-reaching consequences is the fact that the Pension Fund and its amicus say ***absolutely nothing*** about those consequences. They may be content to adopt a nothing-to-see-here approach to this appeal, but this Court should not be as cavalier. After all, one potential consequence of affirming here could be to discourage joint investments in industries that have pension plans, *see* 26 U.S.C. §§ 401(a)(4), 410(b), which would mean

lower overall levels of investment in companies with contribution obligations to underfunded pension plans.

The Pension Fund and its amicus likewise have nothing to say in response to the fact that, under the reasoning the court applied below, *any* transaction or set of transactions to buy or sell a less-than-80% ownership stake in a company may be sufficient to imply a fictitious pass-through partnership, *even if* it is undisputed that the transactions were bona fide, separate business decisions that did not improperly evade withdrawal liability under 29 U.S.C. § 1392(c), and *even if* it is undisputed that the investors chose to invest through a formal limited-liability entity. *See* Appellants'.Br.58. That silence is deafening. Indeed, if the "purpose" of the MPPAA were as sweeping as they say, Congress would not have imposed any ownership floor, much less the high threshold of 80%, to impose liability. But it did. Inventing implied partnerships to circumvent that express limitation runs contrary to the text of the statute.

The hollowness of the Pension Fund's position is laid bare in its conclusion. Br.39–40. While disparaging Appellants' arguments as "decidedly political," Br.39, and asserting that "whether a private equity

firm's investment is 'good' or 'bad' for … pension funds is … not the proper subject of this case," Br.40, the Pension Fund block-quotes a page-long blog entry denigrating private "equity firms" as "Evil Doers" who "profit[] by financial engineering," *id*. That is false. What is true is that the decision below engineers an end-run around the MPPAA's threshold on liability as well as time-tested corporate law principles, which if not reversed will have sweeping ramifications beyond the context of this case, this industry, or this statute.

## II. The Fictitious Partnership-In-Fact Was Not Engaged In Any "Trade Or Business" Under 29 U.S.C. § 1301(b)(1).

Even if this Court accepts the district court's unprecedented decision to aggregate separate ownership stakes among members of a formal limited-liability company into a fictitious partnership-in-fact, the Court should still reverse. That is because the fictitious partnership-in-fact is not operating a "trade or business" within the meaning of 29 U.S.C. § 1301(b)(1) and the law of this case.

### A. All the Fictitious Partnership-In-Fact Could Possibly Have Done Was Make a Mere Investment.

According to the district court, the partnership-in-fact was wholly "antecedent to the existence of [the] LLC" and existed only "prior to" the "formation" of SSB-LLC. 172 F. Supp. 3d at 460, 464. Also according to

the district court, the sole purpose of the partnership-in-fact was to "investigat[e]" SBI as a potential investment, "decide to coinvest," and set up the LLC. *Id.* at 464, 467. The "business" of the partnership-in-fact thus consisted **entirely** of making a profit-motivated **investment** in SBI. That should have compelled the conclusion that the fictitious entity the district court invented was **not** a "trade or business" for MPPAA purposes. This Court's previous opinion could not be clearer: "a mere investment made to make a profit, without more, does not itself make an investor a trade or business." 724 F.3d at 141–42. As explained further below, this Court's prior opinion required "plus" factors, but the fictitious partnership itself would have had none.

Yet, rather than follow its own factual premises to the logical conclusion, the district court found that the partnership it invented was engaged in a "trade or business" under 29 U.S.C. § 1301(b)(1) by attributing to the fictitious partnership actions that SFIII and SFIV (*i.e.*, the "partners") separately took **after** the decision to invest in SBI was made and the LLC was set in place. 172 F. Supp. 3d at 466–67. The Pension Fund similarly contends that the fictitious partnership "employed … operating strategies to increase the value" of SBI, which

they say it did "through the actions of [its] principals." Br.38; *see* Br.25–26. But "operating strategies" can only be "employed" ***after*** the decision to invest has been made. Again, the district court ruled that the fictitious partnership existed ***solely*** for the limited purpose of "investigat[ing]" SBI as a potential investment, "decid[ing] to coinvest," and setting up the LLC. 172 F. Supp. 3d at 460, 464, 467. Conduct that took place via the LLC therefore cannot be attributed to the "antecedent" partnership (*id.* at 460) as a matter of either law or logic. The district court's conclusion (and the Pension Fund's defense of it) therefore fails on its own terms.

The Pension Fund's next defense of the district court's erroneous conclusion suffers from a related flaw. The Pension Fund recognizes that the *sine qua non* of the fictitious partnership-in-fact was SFIII and SFIV's "joint activity … to decide to coinvest," which came "prior to [the] formation" of the LLC. Br.23 (quoting 172 F. Supp. 3d at 464). Yet the Pension Fund proceeds to ignore ***what this Court already held***, namely, that "[i]t is one thing to manage one's investments in business" but "another to manage the businesses in which one invests." 724 F.3d at 134. Only the latter suffices under the law of this Circuit and the law of this very case. Yet under the district court's own logic, the fictitious

partnership-in-fact did only the former. There is no way to square that clear holding with the Pension Fund's attempt to label the partnership-in-fact a "trade or business."

The Pension Fund's final argument has even less merit. According to the Pension Fund, SFIII and SFIV's decisions to invest in portfolio companies *other than SBI* provide independent bases to support the district court's decision. Br.38–39. This is despite the undisputed fact that out of 43 and 52 different investments made by SFIII and SFIV, respectively, only a mere seven even overlap at all. 172 F. Supp. 3d at 465 n.14. The spectacular breadth of the Pension Fund's argument only underscores the error of the decision below. It should be obvious that partner-level activity to invest in *entirely different* businesses cannot be attributed to a partnership-in-fact whose entire "business" was deciding whether or not to invest *in SBI*. But under the expansive conception of a "trade or business" adopted below, that obvious point was obfuscated. In any event, the Pension Fund's argument lays bare just how broad its theory sweeps: If, as it argues, the fictitious "Sun Fund III/IV Partnership" extends beyond the investment in SBI and reaches five other portfolio companies, Br.15; *see* Br.9, then these other portfolio

companies would ***also be liable*** for SBI's withdrawal liability under ERISA—despite the fact that SFIII and SFIV invested in each of them through separate formal limited-liability companies—based solely on an implied-in-fact partnership purportedly created when SFIII and SFIV investigated making investment decisions, before making a single purchase.

PBGC goes even further, advancing a guilt-by-association rationalization for treating the fictitious investment partnership as a "trade or business." Under its rationale, because SFIII and SFIV "at the top of the chain" were found to satisfy the definition of "trade or business," and because "Scott Brass, at the bottom of the chain, is a trade or business," it follows that "all entities within a parent-subsidiary chain between two trades or businesses are themselves trades or businesses." PBGC.Br.25. Nonsense. Unsurprisingly PBGC musters a feeble "cf." citation for this extraordinary proposition, which none of the cases that follow support. Even accepting that SFIII and SFIV are each engaged in a "trade or business," *but see* Appellants'.Br.64 n.8, it does not follow that an implied partnership they (purportedly) created for purposes of making a financial investment was ***itself necessarily*** a "trade or business."

## B. The Fictitious Partnership-In-Fact Lacks Any "Plus" Factors.

Similarly, there are no "plus" factors that can be attributed to the district court's fictitious partnership that would justify the district court's conclusion that the entity it invented qualified as a "trade or business" under this Court's case law. In its prior opinion in this case, this Court adopted "an 'investment plus' approach" to "evaluating the 'trade or business' prong of § 1301(b)(1)." 724 F.3d at 141. Applying that approach, this Court held that SFIV derived "a direct economic benefit" from its management activity "that an ordinary, passive investor would not derive"—namely, "an offset against the management fees it otherwise would have paid its general partner for managing the investment in SBI"—and thus satisfied the investment-plus standard. *Id.* at 143.

On remand, the district court did not find that the fictitious partnership itself obtained any such offset. Nor did it find the fictitious partnership itself obtained any economic benefit not available to an ordinary investor. Nor could it have made such a finding. Even assuming that the fictitious partnership existed, the district court concluded that it existed solely to investigate whether to invest in SBI, and it obtained no direct economic benefits from doing so. *See* 172 F.

Supp. 3d at 460, 464, 467. It had no funds, no accounts, no accounting books, no financial reports, no tax filings, no corporate documents, no employees, no executives, and no assets of any kind. In short, it had no "plus" factors making it a "trade or business" within the meaning of § 1301(b)(1).

That should have been the end of the road for the Pension Fund's position. But under the sweeping, outcome-driven approach the district court adopted, it was a mere speedbump. Rather than conclude that the lack of plus factors meant that the partnership-in-fact it created was not engaged in a "trade or business" under common control with SBI, the district court asked whether SFIII and SFIV *themselves* "received 'any benefit' from the management of Scott Brass, Inc." *Id.* at 457. The answer to that question was controlled by this Court's decision that SFIV satisfied the plus-factor test due to its receipt of a management-fee offset. 724 F.3d at 141–43. But that looks at the wrong entities and the wrong time-period. After all, under the district court's rationale, the fictitious partnership was "antecedent to the existence of [the] LLC" and existed only to explore a potential investment, not to operate or reap the benefits of investment. 172 F. Supp. 3d at 460, 464, 467. If that sounds artificial,

it is because the district court made up the bounds of this fictitious partnership and then looked beyond them in attempting to satisfy the plus factors.

The district court's plus-factor analysis also failed in another respect. Although the district court was mistaken in thinking that the plus-factor inquiry *vis-à-vis the fictitious partnership* depended on the acts of its partners (SFIII and SFIV) rather than whether *the partnership itself* derived a benefit unavailable to an ordinary passive investor, it got at least one thing right: The district court refused to adopt an approach to the plus-factor inquiry that "would depend entirely upon acts of … the Funds' General Partners," because those partners constituted "[a] separate entit[y]" from the funds themselves. 172 F. Supp. 3d at 457. The inconsistency is obvious on its face. Despite refusing to attribute to SFIII and SFIV the conduct of their own respective general partners, the district court had no trouble attributing to the fictitious partnership the conduct of its respective general partners. That conclusion finds no support in either law or logic.

The district court's plus-factor analysis cannot be defended, and the Pension Fund's argument is even more off base. According to the Pension

Fund, SFIII and SFIV's "involvement" in managing SBI "evidences" that "their involvement … was something more" than passive investment. Br.39; *see also* Br.19–20 (arguing that SFIII and SFIV engaged in "strategic, coordinated, and concerted activity in the purchase ***and management*** of SBI" (emphasis added)). But, as just explained, the "trade or business" issue ***as to the fictitious partnership*** cannot be resolved by conduct of SFIII and SFIV that postdated the activity of the fictitious partnership (investigating whether to invest in SBI and setting up the instrument through which to make that investment).

The district court and the Pension Fund's persistent inability to disassociate the partners from the partnership itself, and their mixing and matching of conduct to satisfy the plus factors, is nonetheless telling. The only way one could tag the fictitious partnership with meaningful "plus" factors is to attribute to the partnership partner-level conduct beyond the scope of the partnership's business. And given the district court's conclusion that the business of the fictitious partnership was "antecedent to" the business of the LLC, the only way the fictitious partnership can be considered a "trade or business" under § 1301(b)(1) is

to ignore this Court's holding of what it requires for an entity to be a trade or business.

\*　　　　\*　　　　\*

Under the district court's own findings, the only thing the fictitious partnership could properly be said to have done is decide to make an investment in SBI. And under this Court's case law—including the law of this very case—making a mere investment is not enough. So even if the district court's unprecedented decision to create a fictitious partnership-in-fact atop a formal LLC is not reversed, the decision below still must fall, because that fictitious partnership-in-fact cannot be considered a "trade or business" for purposes of 29 U.S.C. § 1301(b)(1).

# CONCLUSION

The judgment below should be reversed.

Respectfully submitted,

/s/ John C. O'Quinn

Theodore J. Folkman (#81828)
PIERCE BAINBRIDGE BECK
  PRICE & HECHT LLP
One Liberty Square
Boston, MA 02109
(617) 313-7401

John C. O'Quinn (#1187036)
Matthew D. Rowen (#1177695)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000

John F. Hartmann
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 862-2000

*Counsel for Plaintiffs-Appellants*

August 19, 2019

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,492 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Local Rule 34(a).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Century Schoolbook size 14-point font with Microsoft 2016.

Date: August 19, 2019

*/s/ John C. O'Quinn*
John C. O'Quinn

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ John C. O'Quinn
John C. O'Quinn